# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | W. Thomas Rosemond, Jr. |
|---|---|---|---|
| **CASE NUMBER** | 99 C 8049 | **DATE** | 3/7/01 |
| **CASE TITLE** | Welsh v. Apfel | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]

Magistrate Judge's **Report** recommending that the District Judge deny plaintiff's Summary Judgment motion and grant defendant's Summary Judgment motion is hereby entered of record. The decision of the Commissioner is affirmed.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | MAR 0 8 2001 | |
| | Notified counsel by telephone. | | | date docketed | |
| x | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| x | Copy to judge. | | | | |
| | CL/lc | courtroom deputy's initials | | date mailed notice | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VICKI A. WELSH,                    )
                                   )
            Plaintiff,             )
                                   )        Case No. 99 C 8049
      v.                           )
                                   )
KENNETH S. APFEL,                  )
Commissioner, Social               )
Security Administration,           )                         DOCKETED
                                   )
            Defendant.             )                         MAR 0 8 2001

TO:  The Honorable Joan B. Gottschall
     United States District Court

### REPORT AND RECOMMENDATION

W. Thomas Rosemond, Jr.
United States Magistrate Judge

Before the Court are Plaintiff's and Defendant's <u>Motions for Summary Judgment</u>.  Plaintiff's <u>Motion for Summary Judgment</u> is denied.  Defendant's <u>Motion for Summary Judgment</u> is granted.  The decision of the Commissioner is affirmed.

### STANDARD

Judicial review is limited to determining whether the Administrative Law Judge ("ALJ") applied the correct legal standards in reaching his decision[1] and whether there is substantial evidence in the record to support the ALJ's findings.[2]  Substantial evidence is "such relevant evidence as a

---

[1] <u>Howell v. Sullivan</u>, 950 F.2d 343, 346 (7th Cir. 1991).

[2] <u>Schroeter v. Sullivan</u>, 977 F.2d 391, 394 (7th Cir. 1992).

reasonable mind might accept as adequate to support a conclusion."[3]

The determination of disability under the Social Security Regulations follows a five-step test.[4] The claimant bears the burden of proving a disability in steps one through four, but the burden shifts to the Commissioner in step five to show that the claimant has the ability to engage in other types of gainful employment existing in the national economy.[5] As Plaintiff has raised issues pertaining solely to this last step of the five-step process, we will examine whether the ALJ's decision to find claimant not disabled was based on substantial evidence that claimant's residual functional capacity allowed her to gain employment consistent with that capacity.

## BACKGROUND.

To satisfy the first step of the five-step process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date, August 30, 1990.[6] In regards to the next step, the ALJ found that Plaintiff had severe physical impairments, **to-wit**: non-insulin dependent diabetes

---

[3] Richardson v. Perales, 402 U.S. 389, 401 (1971).
[4] 20 C.F.R. § 404.1520; see also Schroeter, 977 F.2d at 393. The five-step process in its entirety asks: (1) is the claimant presently unemployed; (2) is the claimant's impairment severe; (3) does the impairment meet or equal one of the impairments specified in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is the claimant unable to perform past relevant work; and (5) does the claimant's age, education and past work experience enable him or her to do other work?
[5] Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000).
[6] R. at 13.

mellitus, arthritis, fibromyalgia, partial hearing loss, a
history of peptic ulcers and obesity. However, none of
claimant's impairments or a combination thereof met nor equaled
the relevant criteria of a listed impairment.[7]

The ALJ then determined the residual functional capacity of
the claimant for work as follows: lifting no more than twenty
pounds occasionally and ten pounds frequently; standing and
walking no more than two hours in an eight-hour work day, and
sitting no more than six hours in an eight-hour work day; only
occasional climbing, stooping, crouching, or crawling; no work
around heights or dangerous moving machinery; only one-to-one
communication with co-workers and supervisors; and no acute
bilateral hearing. From the testimony of a vocational expert,
the ALJ concluded that claimant was unable to perform her past
relevant work in her present residual functional capacity.

However, the ALJ primarily used the evidence of this same
testimony, as well as other evidence in the record, to show that
the claimant had the ability to engage in other types of gainful
employment in the national economy.

**HEARING TESTIMONY.**

Plaintiff was 48 years old at the time of the hearing. She
graduated from high school, where she was in special education
and the EMH program for the mentally handicapped.[8] Her previous
jobs included serving as a cook in a children's home for fifteen

---

[7] <u>Id.</u> at 13-15.
[8] R. at 289, 318.

years; then as a merchandise pricer at a Sears outlet Store; then as an assembly worker at a factory for six months; and then as a fast food cook for a short time.[9] Plaintiff also participated in a Department of Rehabilitation Services ("DORS") training program for ten months (also known as the Jewish Vocational Service ("JVS")[10]), but has had no employment thereafter (from January 1995).

During the 10 months in the DORS program, Plaintiff worked for an Environmental Protection Agency building, where she assisted employees with office supplies.[11] In this capacity, Plaintiff filled out forms and got the office supplies.[12] However, Plaintiff testified that she could not do the job after a while because there was too much standing and walking involved.[13]

Plaintiff testified that she gets pain in several places, mainly the neck, shoulders, back, knees, backs of her legs and toes.[14] She explained that if she were to work all day, she would be in constant pain; even writing a letter would cause her pain the next day.[15] Plaintiff is right-handed,[16] and testified that her fingers hurt when she tries to write, or type, or do

---

[9] R. at 289-95, 320.
[10] R. at 307.
[11] Id.
[12] Id.
[13] R. at 308.
[14] R. at 307.
[15] R. at 306.
[16] R. at 289.

housework such as scrubbing counters.[17]  The pain is localized in the fingertips and top joints of the fingers, along with the wrist, the right hand being worse than her left in this regard.[18] Plaintiff maintains that she had difficulty grasping heavy items, such as coffee cups and glasses, and picking up small items from a tabletop.[19]

The ALJ inquired about Plaintiff's attempts at weight loss, to which Plaintiff responded that it was difficult to maintain a diet program due to her stomach condition.[20]  She stated that she has an ulcer and a "nervous" colon, which can be aggravated by several factors, including nervousness, certain foods, the heat, and dairy products.[21]  Occasionally, her ulcer flares up requiring her to use the bathroom about three times every 10 minutes at the onset of the flare-up, after which she is usually able to control the situation with **Pepto-Bismol**.[22]

Currently, Plaintiff takes three different medications to treat her ulcer, fibromyalgia and sinus pressure and related dizziness.[23]  She has tried a number of pain medications over the years, but her current medicine, **Arthrotec**, is the strongest and more effective.[24]  In addition, Plaintiff has glaucoma and a

---

[17] R. at 309.
[18] R. at 310.
[19] R. at 313.
[20] R. at 308.
[21] R. at 297.
[22] R. at 311-12.
[23] R. at 300.
[24] R. at 314.

tumor in her right eye that she has been treating with antibiotic drops.[25]

Plaintiff attributes her nervousness to her hearing difficulty.[26] Plaintiff is deaf in her right ear, and uses a hearing aid in her left ear.[27] She reads lips to supplement her hearing, and has difficulty understanding what people are saying when they are looking away from her.[28]

Plaintiff states that she can walk about forty-five minutes to an hour to the store and back.[29] She testified that she can lift 10 pounds, but gets out of breath at this exertion.[30] She cannot sit for more than 30 minutes without getting stiff, and she can sometimes remain standing for about 30 minutes to do housework.[31] Plaintiff experiences shoulder pain and dizziness when she reaches up over her head to a shelf.[32]

Plaintiff testified that usually three or four days out of the week are "bad days" for her, wherein she experiences one or more of her ailments.[33] On these bad days, which usually occur if she has done some work on the previous day, Plaintiff devotes the entire day to rest, usually sitting or lying down.[34] In her own judgment, Plaintiff states that her joint and muscular pain

---

[25] R. at 297-99.
[26] R. at 311.
[27] R. at 316.
[28] R. at 316-17.
[29] R. at 301-2.
[30] R. at 302.
[31] Id.
[32] R. at 315.
[33] R. at 317.
[34] R. at 320.

is the impairment that most prevents her from working an eight-hour day.[35]

Plaintiff testified that she prepares the evening meal every night at her home for her family.[36] She can sew, go to church, walk to the store and back, and reads with the aid of glasses.[37] Plaintiff spends "a good deal of time" reading, and visits the library every couple of weeks to check out new books.[38]

## Testimony of the Vocational Expert.

Dr. Richard Hamersma, a vocational expert, testified at Plaintiff's hearing. The ALJ gave Dr. Hamersma a hypothetical individual with approximately the same age, education level and medical diagnoses as Plaintiff. The residual functional capacity of this individual was limited as follows: lifting not more than 20 pounds occasionally and 10 pounds frequently; standing no more than two hours in an eight-hour workday; sitting for no more than six hours of an eight-hour workday; only occasional climbing, stooping, crouching or crawling; no work around heights or dangerous moving machinery; only one-to-one communication with co-workers and supervisors; and no work requiring acute bilateral hearing.[39]

According to Dr. Hamersma, this individual could perform work at the sedentary to light unskilled level in a sit/stand

---

[35] R. at 319.
[36] R. at 303.
[37] R. at 305, 318.
[38] R. at 320.
[39] R. at 323-24.

position.[40]  Specifically, the vocational expert testified that
such an individual would be able to perform jobs such as an
assembler, hand packager and inspector.[41]  Dr. Hamersma stated,
however, that this individual would not be able to perform
Plaintiff's past jobs as a cook and a merchandise pricer.[42]

The ALJ's other hypothetical assumed an individual at the
sedentary level with an added limitation of difficulty grasping
and manipulating objects, or using her hands frequently.[43]  Dr.
Hamersma found in this situation that there would be no work
available for such an individual.[44]  Plaintiff's counsel
questioned the vocational expert about the impact that
Plaintiff's need to lie down during the course of an eight hour
workday would have on the availability of work.[45]  Dr. Hamersma
replied that it would depend on the length of time and the
frequency with which such extended breaks would take place.[46]  He
also stated that the customary tolerance in the workplace would
not allow an individual to take three or four days of absence per
month.[47]  Although one hypothetical posed by Plaintiff's attorney
included a daily nap, none of the hypotheticals posed to the
vocational expert included Plaintiff's "fatigue, sleep apnea, and
daytime somnolence."  Whether claimant's sleep apnea was

---

[40] R. at 324.
[41] Id.
[42] R. at 325-6.
[43] R. at 326.
[44] Id.
[45] R. at 327.
[46] R. at 328.
[47] Id.

controlled or uncontrolled and its effect on her ability to work was never developed below.  We are somewhat troubled by the lack of record development in this area, but it does not change our decision.

## MEDICAL EVIDENCE.

Plaintiff claims to have become disabled on August 30, 1990 due to the following medical conditions: nervous colon, loss of hearing, diabetes, arthritis and a dermoid tumor in the eye.[48] She takes several medications, which her treating physician indicates may cause her to become dizzy or experience abdominal pain.[49]

In her disability report dated May 15, 1995, Plaintiff states that she does light housework, including vacuuming, dusting, laundry and cooking dinner.[50]  She also reads books three to four hours per day and watches television one to two hours per day.[51]  Plaintiff makes a trip to the library twice a week, where she remains for a couple of hours.[52]  In Dr. Narang's report from July 1995, Plaintiff states that she is able to walk three to four blocks slowly and climb a flight of stairs.[53]

In June 1990, Plaintiff was officially diagnosed with non-insulin dependent diabetes mellitus.[54]  Two days later, plaintiff

---

[48] R. at 39.
[49] R. at 271.
[50] R. at 46.
[51] Id.
[52] Id.
[53] R. at 174.
[54] See, e.g. R. at 94.

suffered a hypoglycemic seizure on June 23, 1990.[55]  Plaintiff

has been prescribed an oral diabetes medication (**Glynase**), with

some suboptimal control due to her inability to follow a diabetic

diet and monitor her blood sugar level on a regular basis.[56]  She

has not been prescribed insulin, and has not been diagnosed with

any diabetes-related medical complications, such as diabetic

retinopathy.[57]

During late 1991 and early 1992, Plaintiff suffered from

Costochondritis.[58]  Medical records from November 1991, February

1992, April 1992, May 1992, and June 1992 indicate complaints

consistent with this disorder.  Plaintiff was treated with

**Naprosyn** and **Voltaren**, with good result.[59]

Plaintiff also has arthritis.[60]  On July 18, 1992, Plaintiff

was examined for shoulder pain by Dr. Devare.  She had right

shoulder tenderness with abduction and elevation.  On September

12, 1992, Plaintiff complained of left shoulder pain but made no

complaint of right shoulder pain.  She had right shoulder pain on

January 17, 1995.[61]  Dr. Parmod Narang noted right wrist

tenderness, with slight swelling but no redness present, and

slight swelling and tenderness of the right knee on July 13,

---

[55] R. at 90.
[56] R. at 139-140, 144, 192.
[57] R. at 192.
[58]Costochondritis is tenderness of the rib and lung region.  R.
at 131.
[59] R. at 16.
[60] See, e.g. R. at 136.
[61] R. at 136.

1995.[62]  Plaintiff's finger joints were tender on November 2,

1995, but with no swelling.[63]  On April 1, 1996, Dr. Stein noted

that Plaintiff had arthritic pain in her neck, shoulders, and

hips, and that this pain "gets worse as the day wears on.[64]  He

diagnosed Plaintiff with probable fibromyalgia[65] in June, which

he said prevented her from any type of conditioning exercise.[66]

In 1996, Plaintiff had been taking **Ibuprofen** for her arthritis.[67]

   Plaintiff suffers from obesity.  In June 1990, Plaintiff

weighed 250 pounds.[68]  Dr. Stein indicated in January 1995 that

Plaintiff had been on "yo-yo" diets for years.[69]  Over the period

from 1990 to 1997, Plaintiff's weight was recorded as low as 232

pounds and as high as 258.[70]

   Plaintiff suffers from ulcers.  Plaintiff had no prior

history of ulcer in her April 1992 examination by Dr. Doria

Devare, but was prescribed **Maalox**, **Tagamet** and **Zantac** in

following checkups for gastritis.[71]  After an upper

gastrointestinal exam was conducted, Plaintiff was diagnosed by

---

[62] R. at 174-75.
[63] R. at 189.
[64] R. at 189.
[65] Fibromyalgia includes symptoms of pain all over, fatigue,
disturbed sleep, and multiple tender spots that when pressed
firmly cause the patient to flinch.  See Sarchet v. Chater, 78
F.3d 305, 306 (7th Cir. 1996).
[66] R. at 215.
[67] R. at 135-38.
[68] R. at 92.
[69] R. at 138.
[70] R. at 262.
[71] R. at 126, 131-33.  Gastritis is an inflammation of the
stomach that may be accompanied by nausea, pain and distention of
the stomach.  Dorland's Illus. Med. Dictionary, 27th Ed.

Dr. Stein with an active ulcer of the duodenal bulb and mild gastroesophageal reflux in January 1996.[72]  She was given **Prilosec** and **Pepto-Bismol**.[73]

Plaintiff has an eye tumor.  In February 1995, Plaintiff was diagnosed with glaucoma and a dermoid conjuctival cyst of the right eye.[74]  Several records indicate that Plaintiff's vision is normal.[75]

Plaintiff has limited hearing.  Plaintiff is completely deaf in the right ear and wears a hearing aid in the left ear, which apparently enables her to understand normal conversation.[76]  She supplements this by reading lips.[77]  Although Plaintiff's speech is slow and impaired, it is understandable.[78]

Plaintiff has also experienced mental illness including anxiety and depression.  On October 6, 1993, Dr. Alexander Eschbach, a licensed clinical physician, evaluated Plaintiff in a neuropsychological screening.[79]  He reasoned that Plaintiff could perform simple, repetitive actions which require no decision making and little "executive" functioning; however, he opined that Plaintiff might become emotionally overwhelmed with duties that require problem solving, resulting in mildly to moderately

---

[72] R. at 114.
[73] R. at 138.
[74] R. at 171.
[75] R. at 171, 173, 192.
[76] R. at 271.
[77] R. at 214.
[78] R. at 271.
[79] R. at 154.

debilitating anxiety and depression.[80]   Dr. Eschbach concluded

that easily-learned, light manual tasks would be best for

Plaintiff, rather than verbally-mediated tasks.[81]

Dr. Phillip Mankoff, a state clinical psychologist,

evaluated Plaintiff on November 13, 1993.  Dr. Mankoff evaluated

Plaintiff's IQ at 85, a low average classification.[82]  He found

that Plaintiff seemed to be easily overwhelmed and had some

anxieties, but felt that there was no need to recommend

psychotherapy for her.[83]  Dr. Mankoff also concluded that

Plaintiff would not do well with duties requiring problem

solving, and if presented with such, Plaintiff would become

emotionally overwhelmed and experience moderately debilitating

anxiety and depression.[84]  He recommended that she pursue easily-

learned, repetitive light manual tasks, such as light office work

and/or filing, and pursue JVS training to this end.[85]

**Medical assessments of Plaintiff's work-related ability**.

On July 24,1995, Dr. Earl W. Donelan, M.D., a consulting

physician for the state, examined Plaintiff for a residual

functional capacity assessment.[86]  He found that Plaintiff could

occasionally lift 50 pounds; frequently lift 25 pounds; stand

and/or walk for about six hours in an eight-hour workday; sit for

---

[80] R. at 156-7.
[81] R. at 157.
[82] R. at 158.
[83] R. at 161.
[84] R. at 161-62.
[85] R. at 162.
[86] R. at 176-83.

about six hours in an eight-hour workday; and no limitations on pushing and/or pulling, climbing, balancing, stooping, kneeling, crouching and crawling.[87] Dr. Donelan also found limited abduction of Plaintiff's arms above her head.[88]

Dr. Syed Asghar, M.D., one of the Plaintiff's treating physicians, examined Plaintiff on November 2, 1995.[89] Dr. Asghar concluded that Plaintiff had moderate capacity to do work-related activities.[90]

Dr. Ernst Bone, M.D., a state agency consulting physician, reviewed Plaintiff's medical records on January 17, 1996.[91] He opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, and she could stand at least two hours and sit at least six hours in an eight-hour workday.[92] Dr. Bone recommended no work requiring bilateral hearing acuity or prompt spontaneous speech for performance or safety.[93]

On July 6, 1996, Dr. Ty Stein, M.D., Plaintiff's treating physician, stated on a medical assessment form that Plaintiff could stand and walk for 15 minutes at a time for one to two hours out of an eight-hour workday.[94] He opined that she could sit eight-hours out of an eight-hour workday.[95] Dr. Stein

---

[87] R. at 177-78.
[88] R. at 179.
[89] R. at 185-191.
[90] R. at 185.
[91] R. at 193-200.
[92] R. at 194.
[93] R. at 197.
[94] R. at 214.
[95] Id.

answered "no" to the question "Does your patient need to lie down intermittently throughout the day?"[96] Dr. Stein believed that Plaintiff could lift 10 pounds occasionally and two to five pounds frequently, and had no restrictions in grasping, handling, and manipulating objects, but she was restricted from bending; pushing; and pulling; and reaching above her head.[97]

In an addendum two months later, Dr. Stein stated that Plaintiff's "fatigue, sleep apnea, and daytime somnolence effectively prevents her from remaining attentive and alert enough to concentrate on even sedentary type tasks" and that "she is incapable of **any** type of work."[98]

On March 26, 1998, Dr. Gina Drugas, M.D., Plaintiff's treating physician, stated in her medical assessment that Plaintiff could stand for thirty minutes and walk for an hour uninterrupted, as well as stand or walk for four hours out of an eight-hour workday.[99] In answer to the question "Does your patient need to lie down intermittently throughout the day?", Dr. Drugas indicated that Plaintiff should take a one-hour daily nap because of pain in her joints and also because it would help her relax.[100] According to Dr. Drugas, Plaintiff can carry 20 pounds occasionally and 10 pounds frequently; has no difficulty bending

---

[96] Id.
[97] Id.
[98] R. at 215 (emphasis in record).
[99] R. at 270.
[100] Id.

or reaching; should only push or pull a low weight; and says that she cannot open a jar and that she drops things easily.[101]

## THE ALJ'S FINDINGS.[102]

1. The claimant met the disability insured status requirements of the Act on August 30, 1990, the date the claimant stated she became unable to work, and continued to meet them only through March 31, 1997.

2. The claimant has not engaged in substantial gainful activity at any time since August 30, 1990.

3. The medical evidence establishes that the claimant is severely impaired by non-insulin dependent diabetes mellitus, bilateral hearing loss, obesity, peptic ulcer disease, arthritis, and fibromyalgia, but that she does not have an impairment or combination of impairments which meets or equals the relevant criteria of any impairment listed at 20 C.F.R., Part 404, Subpart P, Appendix 1.

4. The claimant's subjective complaints and functional limitations are inconsistent with the record as a whole.

5. The claimant retains the residual functional capacity for work requiring lifting no more than twenty pounds occasionally and ten pounds frequently; standing and walking no more than two hours in an eight-hour work day, and sitting no more than six hours in an eight-hour work day; only occasional climbing, stooping, crouching, or crawling; no work around heights or dangerous moving machinery; only one-to-one communication with co-workers and supervisors; and no acute bilateral hearing.

6. The claimant's impairments preclude her from returning to her past relevant work.

7. The claimant is a younger individual, with a high school education obtained through special education classes, and some deficiencies in reading, spelling, and mathematics, and a history of no more than semi-skilled work, with no work skills transferable to her present residual functional capacity.

---

[101] Id.
[102] R. at 22.

8.  Considering the claimant's maximum sustained work
    capability, age, education, and past work experience,
    there are other jobs the claimant is capable of
    performing which exist in significant numbers in the
    national economy, including assembler, hand packager,
    and inspector.

9.  The claimant has not been under a disability as defined
    in the Social Security Act at any time since August 30,
    1990.

### DISCUSSION.

This Court is limited to reviewing whether the ALJ correctly

determined that Ms. Welsh is not disabled.  We do not make a

determination on whether Plaintiff is disabled, but whether the

ALJ acted appropriately in making his finding.  To this end, it

has been suggested that the Court consider the following as part

of the evaluation: **(1)** the clinical findings of treating and

examining physicians; **(2)** the diagnoses of these physicians;

**(3)** the subjective evidence of pain and disability as testified

to by the plaintiff and as observed by others; and **(4)** the

claimant's educational background, work history, and present

age.[103]

The ALJ found that Plaintiff did not have any listed

impairment or combination of listed impairments.[104]  He then

proceeded to determine Plaintiff's residual functional capacity,

which would be used in steps four and five of the five-step

process to see whether Plaintiff could perform any of her past

relevant work, or if not, whether there is any work that she

---

[103] Whitney v. Schweiker, 695 F.2d 784, 786 (7th Cir. 1982).
[104] R. at 22.

could do that exists in substantial numbers in the national economy.

As Plaintiff has only raised issues relevant to the fifth step of the process, concerning whether Plaintiff is able to perform any other jobs existing in the national economy, we will not explore the effect that the ALJ's findings had on the first four steps. Plaintiff has raised three issues, which will be addressed below. The burden of proof at the fifth step shifts to the Commissioner to establish that there are other jobs existing in significant numbers in the national economy that claimant could perform in her current residual functional capacity.[105] This determination also takes into account Plaintiff's age, education and past work experience.

The primary issue raised by Plaintiff in her motion is that her residual functional capacity should have been reduced. However, the ALJ found no substantial support for further reduction in Plaintiff's residual functional capacity, due to significant inconsistencies in the record as a whole.[106] The ALJ attributed this finding to the inconsistency between Plaintiff's own testimony of her ongoing pain and incapacitation, and the absence of objective medical evidence in the record that would account for Plaintiff's asserted worsening of her condition.

The medical records as a whole are lacking in certain procedures and examinations that could have provided Plaintiff

---

[105] See, e.g. Clifford, 227 F.3d at 868.
[106] R. at 16.

with more to reinforce her debilitating medical conditions. Whether this is an oversight on the part of her physicians is not known. We do agree, however, that there were "minimal clinical findings noted" in certain crucial periods for Plaintiff, most pointedly in each of her examinations with her treating physicians.[107]

Plaintiff is essentially claiming that the ALJ should have "played doctor" by interpreting the sparse notes and chronicles submitted by her physicians in her own favor. These specific medical conclusions were not explicitly made by any of the physicians in their notes, and thus, the ALJ acted properly by making the determination solely from what he was given in the medical record.

### The ALJ did not fail to adequately consider plaintiff's mental and digestive impairments in light of the record.

Plaintiff claims that the ALJ ignored an entire line of evidence, **to-wit**: the JVS psychiatric evaluations of claimant's mental abilities. According to the psychological evaluations, her nervousness is caused by a dependent personality and a tendency to become overwhelmed.[108] Plaintiff claims that the ALJ did not include a discussion of the JVS-ordered psychological evaluations, which Plaintiff considered "very curious" in light of the ALJ's "rather detailed discussion" of other medical evidence in the record.

---

[107] R. at 17.
[108] See generally R. at 154-163.

Even though this circuit does not require a written evaluation of every piece of testimony and evidence submitted, "a minimal level of articulation is required in cases where considerable evidence is presented to counter the agency's position."[109]  "An ALJ must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning.  His failure to consider an entire line of evidence falls below this minimum level of articulation required.  However, an ALJ need not provide a complete written evaluation of **every** piece of testimony and evidence."[110]

To meet the minimum articulation standard, the reviewing court should be able to track the ALJ's reasoning regarding the evidence he cites to his conclusion.  In addition, we should be certain that the ALJ considered the important evidence to this end.  Finally, we must insure that the ALJ reached a result consistent with his credibility determination.[111]

The ALJ sufficiently evaluated the psychiatric findings in his opinion.  The importance of the nervousness and stomach upset ailments is that they create additional limitations on Plaintiff's residual functional capacity, **to-wit**: problems with concentration and the need for daily rest.  In her testimony, Plaintiff states that she frequently suffers from ulcer flare-ups

---

[109] Zblewski v. Schweiker, 732 F.2d 75, 79 (7th Cir. 1983).
[110] Diaz v. Chater, 55 F.3d 300, 307-08 (7th Cir. 1995)(emphasis added); see also Books v. Chater, 91 F.3d 972, 980 (7th Cir. 1996).
[111] Nelson v. Apfel, 131 F.3d 1228, 1238-39 (7th Cir. 1997).

20

when she gets nervous.  However, neither of the psychiatric records state that her nervousness is either an incapacitating or disabling condition.

Plaintiff believes that the ALJ should have come to the conclusion **on his own** that her mental and digestive impairments were interrelated.  This is a medical opinion, however, upon which a treating or examining doctor should have made an explicit diagnosis.  No such diagnosis is presented in the objective medical evidence on the record. It is quite a stretch, then, for Plaintiff to assume that the ALJ should necessarily draw the medical conclusion from the evidence presented in the record that her mental and digestive symptoms are interrelated.  Plaintiff argues that the ALJ did not analyze the condition other than to say that the episodes had been recurrent and had been resolved.  The ALJ is not supposed to play the role of physician in this regard.[112]  There were repeated instances where Plaintiff's treating physicians prescribed medicine for her stomach problems, apparently with good results.  The ALJ pointed to Plaintiff's own statement that the flare-ups were remedied in each circumstance by **Pepto-Bismol** in order to reach his conclusion that these episodes are treatable.  Therefore, the ALJ used substantial evidence from the record to accurately describe Plaintiff's stomach impairment.

---

[112] See Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990)("judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.")

Plaintiff implies that the ALJ's failure to consider the severity of the Plaintiff's mental impairment constitutes a failure to determine an accurate residual functional capacity. Plaintiff cited several Social Security Rulings on the subject of mental stressors as an additional exacerbating factor on her medical impairments. Even though Plaintiff's mental condition was not severe enough to be recommended for psychotherapy or other treatment, she argues that the environment at her home is structured to minimize her interaction with physical or mental stressors that would normally exacerbate her nervousness and trigger a flare-up.

However, this argument may be construed in two ways, if we take into account Plaintiff's testimony that she has three to four "bad days" per week, that is, days where she experiences the stomach flare-up. This may indicate that Plaintiff's flare-ups are so unpredictable that she is forced to be confined to her home. We know that this is not the case, because Plaintiff goes to the library twice a week and occasionally goes grocery shopping. On the other hand, and more plausible, the fact that Plaintiff is still experiencing flare-ups even in her structured home environment indicates that there may be something else causing the episodes other than mental stressors.

In fact, the flare-ups are not always linked to her nervousness. The only evidence presented that Plaintiff's nervousness is directly related to her ulcer flare-ups was Plaintiff's own testimony, **to-wit**: nervousness was one of a

number of factors that she cited that would cause a flare up.
Moreover, Plaintiff gave several other examples of factors that
would affect her ulcer, namely ingestion of certain foods and
dairy products, and exposure to heat.[113]

Finally, and most importantly, **both** psychiatrists indicated
in their records that they believe that Plaintiff is capable of
light work.  This finding is clearly consistent with the Agency's
position.

### The ALJ gave appropriate weight to the report of the treating physicians.

Plaintiff claims that the ALJ did not give proper weight to
the opinions of her treating doctors, namely Drs. Stein and
Drugas.  Plaintiff surmises that the ALJ blanketly rejected
crucial parts of each doctor's comments about Plaintiff's
condition because he found no written evidence in the treatment
record or progress notes of certain prescriptions or diagnoses.
Specifically, the ALJ stated that he found no evidence in Dr.
Stein's notes that either conditioning exercises were prescribed
or any diagnosis of impaired concentration due to daytime
somnolence.[114]  Likewise, the ALJ says that Dr. Drugas'
recommendations in regard to Plaintiff's need to take daily naps
was not indicated in the records to be "medically necessary" for
Plaintiff.[115]

---

[113] R. at 297.
[114] R. at 18-19.
[115] R. at 19, 279.

The weight given to a physician's statement necessarily depends upon the extent to which it is "supported by medically acceptable clinical and laboratory diagnostic techniques."[116] Moreover, an ALJ is not a doctor, and thus should avoid commenting on the meaning of a test or lab report when there has been no supporting medical testimony for that result in the record.

Plaintiff claims that the ALJ rejected parts of the reports made by Drs. Stein and Drugas, Plaintiff's primary treating physicians, that would have supported a finding of disability due to complications from fibromyalgia. Both of Plaintiff's treating doctors diagnosed her as having fibromyalgia, a condition with principal symptoms of "'pain all over,' fatigue, disturbed sleep, stiffness, and ... multiple tender spots that when pressed firmly cause the patient to flinch."[117] The Seventh Circuit stated that even though one may be diagnosed with fibromyalgia, "it is difficult to determine the severity of [the claimant's] condition because of the unavailability of objective clinical tests."[118]

Plaintiff asserts that she requires a one-hour daily nap in order to alleviate her symptoms. The ALJ did not believe this proposition was supported by the objective medical evidence in the record. Plaintiff argues that the ALJ should have interpreted Dr. Drugas' statement about her naps as a medical

---

[116] 20 C.F.R. § 404.1526(b); see also Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982).
[117] Sarchet, 78 F.3d at 306.
[118] Id. at 307.

necessity, even though the doctor did not indicate as such on the record. This seems to be asking too much of the ALJ. The ALJ should not be expected to make his decision based on unclear medical evidence from the record.

A similar situation occurred in Books v. Chater,[119] where the plaintiff argued that the hypotheticals that the ALJ posed to the vocational expert did not include his need to lie down for significant periods of time during the day. The Seventh Circuit rejected this argument, mainly by referring to the absence of specific medical instructions for "lying down" in claimant's treating physician's functional evaluation report.[120] "There is no **specific indication** in Dr. Pruscha's findings that Books would ever need to lie down for any length of time during an average workday."[121]

Moreover, in the present case, Dr. Stein had originally answered "no" to the question "Does your patient need to lie down intermittently throughout the day?"[122] The ALJ's omission of these naps as a factor in the hypotheticals presented to the vocational expert was not inappropriate in light of the minimal objective evidence that these naps may have been medically necessary. All that is required of a hypothetical question is that it is supported by the medical evidence in the record.[123]

---

[119] Books, 91 F.3d at 981.
[120] Id.
[121] Id. (emphasis added).
[122] R. at 214.
[123] Ehrhart v. Secretary of Health and Human Servs., 969 F.2d 534, 540 (7th Cir. 1992).

Therefore, the ALJ's determination of the claimant's residual functional capacity in this regard was supported by substantial evidence.

Generally, this Circuit has given greater weight to the treating physician, yet it recognizes the "impartiality and expertise" that a consulting physician may bring to the situation.[124]  To determine Plaintiff's residual functional capacity, in fact, it appears that the ALJ relied **primarily** upon the opinions of Drs. Stein and Drugas, Plaintiff's **treating** doctors.  He did not use the more stringent findings of the examining doctors to find that Plaintiff was capable of moderate capacity employment.  Rather, the ALJ relied the opinions of the two doctors with which Plaintiff had the most frequent medical contact to come to his residual functional capacity estimate.  This defeats Plaintiff's argument that the ALJ had not accorded "very great weight" to the treating physicians' opinions.

## The ALJ's credibility determination is not patently erroneous.

Plaintiff argues that the ALJ based his negative credibility determination for her partly on her testimony about her daily activities and partly on the fact that she did not make any recorded effort to return to work since January 1995.  It is not for the ALJ to conclude, based solely upon a claimant's abilities to engage in certain limited activities, that the claimant is not

---

[124] Books, 91 F.3d at 979.

disabled.[125]  Consequently, the ALJ must not "succumb to the temptation to play doctor."[126]

In this case, however, the ALJ did not come to any improper medical conclusions about Plaintiff's ability to work.  Rather, the ALJ recognized inconsistencies in what the she said she could not do, and what her doctors in fact said that she could do (or was not limited from doing).  The ALJ did not make blanket assumptions that Plaintiff was disabled based solely upon her ability to read, or go grocery shopping, or do routine housework.[127]  Rather, he considered the lack of medical findings on the record in the period where she claimed that she was at the peak of her pain and incapacitation, as well as the minimal amount of medical treatment provided to her during this period.[128]

### The ALJ's findings are supported by substantial evidence.

Even though Plaintiff suffers from a combination of severe impairments, some of which seem to have no foreseeable cure, this Court is constrained by its standard of review and by the legal definition of "disability" under the Social Security Act to find that there was substantial evidence to support the ALJ's determination that she is not disabled.  Substantial evidence supports the ALJ's conclusion that the record as a whole did not show that Ms. Welsh's impairments would prevent her from performing a limited range of light work.

---

[125] See Schmidt v. Sullivan, 914 F.2d 117, 118-19 (7th Cir. 1990).
[126] Id. at 118.
[127] R. at 19-20.
[128] R. at 20.

**Accordingly, it is adjudged, decreed, and recommended as follows:**

1. Plaintiff's <u>Motion for Summary Judgment</u> is denied.

2. Defendant's <u>Motion for Summary Judgment</u> is granted.

3. The decision of the Commissioner is affirmed.

4. Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, the parties must file their objections to the **Report and Recommendation** with The Honorable Joan B. Gottschall within 10 days after being served with a copy of the Report. Failure to file objections within the specified time period waives the right to appeal the Magistrate Judge's Report.[129]

**So Recommended**.

Dated: March 7, 2001

W. Thomas Rosemond, Jr.
United States Magistrate Judge

---

[129]<u>Video Views, Inc. v. Studio 21, Ltd.</u>, 797 F.2d 538 (7th Cir. 1986). <u>See also</u>, <u>The Provident Bank v. Manor Steel Corp.</u>, 882 F.2d 258, 261 (7th Cir. 1989) (when a matter has been referred to a Magistrate Judge, acting as a special master or §636(b)(2) jurist, a party waives his right to appeal if he has not preserved the issues for appeal by first presenting them to the District Judge as objections to the Magistrate Judge's Report).