Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 8049 | **DATE** | 4/19/2001 |
| **CASE TITLE** | Vicki A. Welsh vs. William A. Halter, Acting Commissioner of Social Security | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The Magistrate Judge's Report and Recommendation is adopted in part and rejected in part. Defendant's motion for summary judgment is denied. Plaintiff's motion for summary judgment is granted in part and denied in part. [11] The decision of the Commissioner is reversed, and this action is hereby remanded for further administrative proceedings.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| ✓ | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

APR 25 2001
date docketed

docketing deputy initials

date mailed notice

courtroom deputy's initials

Date/time received in central Clerk's Office

mailing deputy initials

Document Number

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VICKI A. WELSH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 99 C 8049 |
| v. | ) | |
| | ) | |
| WILLIAM A. HALTER, | ) | Judge Joan B. Gottschall |
| Acting Commissioner of Social Security[1], | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED

APR 2 5 2001

## MEMORANDUM OPINION AND ORDER

Plaintiff Vicki A. Welsh seeks judicial review of the Commissioner's final decision to deny her request for Disability Insurance Benefits under the Social Security Act, 42 U.S.C. §§ 416(i), 423(d). This matter was referred to Judge Rosemond, who issued a Report and Recommendation ("Report") on March 7, 2001. Judge Rosemond recommended that the court enter summary judgment in favor of the Commissioner. For the reasons set forth below, Judge Rosemond's Report is adopted in part and rejected in part.

### I. Background

#### A. Facts of the Case

The following facts are taken from Judge Rosemond's Report. The Report accurately sets forth the facts supported by the administrative record, and those facts are not in dispute.

---

[1] On January 20, 2001, William A. Halter became Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d)(1) and the last sentence of 42 U.S.C. §405(g), William A. Halter was automatically substituted for Kenneth S. Apfel as the Defendant in this civil action.

## **Hearing Testimony**

Plaintiff was 48 years old at the time of the hearing. She graduated from high school, where she was in special education and the EMH program for the mentally handicapped. Her previous jobs included serving as a cook in a children's home for fifteen years; then as a merchandise pricer at a Sears outlet store; then as an assembly worker at a factory for six months; and then as a fast food cook for a short time. Plaintiff also participated in a Department of Rehabilitation Services ("DORS") training program for ten months (also known as the Jewish Vocational Service ("JVS")), but has had no employment thereafter (from January 1995).

During the 10 months in the DORS program, Plaintiff worked for an Environmental Protection Agency building, where she assisted employees with office supplies. In this capacity, Plaintiff filled out forms and got the office supplies. However, Plaintiff testified that she could not do the job after a while because there was too much standing and walking involved.

Plaintiff testified that she gets pain in several places, mainly the neck, shoulders, back, knees, backs of her legs and toes. She explained that if she were to work all day, she would be in constant pain; even writing a letter would cause her pain the next day. Plaintiff is right-handed, and testified that her fingers hurt when she tries to write, or type, or do housework such as scrubbing counters. The pain is localized in the fingertips and top joints of the fingers, along with the wrist, the right hand being worse than her left in this regard. Plaintiff maintains that she has difficulty grasping heavy items, such as coffee cups and glasses, and picking up small items from a tabletop.

The ALJ inquired about Plaintiff's attempts at weight loss, to which Plaintiff responded that it was difficult to maintain a diet program due to her stomach condition. She stated that she

has an ulcer and a "nervous" colon, which can be aggravated by several factors, including nervousness, certain foods, the heat, and dairy products. (R. at 297). Occasionally, her ulcer flares up requiring her to use the bathroom about three times every 10 minutes at the onset of the flare-up, after which she is usually able to control the situation with Pepto-Bismol.

Currently, Plaintiff takes three different medications to treat her ulcer, fibromyalgia and sinus pressure and related dizziness. She has tried a number of pain medications over the years, but her current medicine, Arthrotec, is the strongest and most effective. In addition, Plaintiff has glaucoma and a tumor in her right eye that she has been treating with antibiotic drops.

Plaintiff attributes her nervousness to her hearing difficulty. Plaintiff is deaf in her right ear, and uses a hearing aid in her left ear. She reads lips to supplement her hearing, and has difficulty understanding what people are saying when they are looking away from her.

Plaintiff states that she can walk about forty-five minutes to an hour to the store and back. She testified that she can lift 10 pounds, but gets out of breath at this exertion. She cannot sit for more than 30 minutes without getting stiff, and she can sometimes remain standing for about 30 minutes to do housework. Plaintiff experiences shoulder pain and dizziness when she reaches up over her head to a shelf.

Plaintiff testified that usually three or four days out of the week are "bad days" for her, wherein she experiences one or more of her ailments. (R. at 317). On these bad days, which usually occur if she has done some work on the previous day, Plaintiff devotes the entire day to rest, usually sitting or lying down. In her own judgment, Plaintiff states that her joint and muscular pain is the impairment that most prevents her from working an eight-hour day.

Plaintiff testified that she prepares the evening meal every night at her home for her

3

family. She can sew, go to church, walk to the store and back, and reads with the aid of glasses. Plaintiff spends "a good deal of time" reading, and visits the library every couple of weeks to check out new books. (R. at 305, 318).

## **Testimony of the Vocational Expert**.

Dr. Richard Hamersma, a vocational expert, testified at Plaintiff's hearing. The ALJ gave Dr. Hamersma a hypothetical individual with approximately the same age, education level and medical diagnoses as Plaintiff. The residual functional capacity of this individual was limited by the ALJ as follows: lifting not more than 20 pounds occasionally and 10 pounds frequently; standing no more than two hours in an eight-hour workday; sitting for no more than six hours of an eight-hour workday; only occasional climbing, stooping, crouching or crawling; no work around heights or dangerous moving machinery; only one-to-one communication with co-workers and supervisors; and no work requiring acute bilateral hearing.

According to Dr. Hamersma, this individual could perform work at the sedentary to light unskilled level in a sit/stand position. Specifically, the vocational expert testified that such an individual would be able to perform jobs such as an assembler, hand packager and inspector. Dr. Hamersma stated, however, that this individual would not be able to perform Plaintiff's past jobs as a cook and a merchandise pricer.

The ALJ's other hypothetical assumed an individual at the sedentary level with an added limitation of difficulty grasping and manipulating objects, or using her hands frequently. Dr. Hamersma found in this situation that there would be no work available for such an individual. Plaintiff's counsel questioned the vocational expert about the impact that Plaintiff's need to lie down during the course of an eight hour workday would have on the availability of

work. Dr. Hamersma replied that it would depend on the length of time and the frequency with which such extended breaks would take place. He also stated that the customary tolerance in the workplace would not allow an individual to take three or four days of absence per month. Although one hypothetical posed by Plaintiff's attorney included a daily nap, none of the hypotheticals posed to the vocational expert included Plaintiff's alleged fatigue, sleep apnea, and daytime somnolence.

### Medical Evidence

Plaintiff claims to have become disabled on August 30, 1990 due to the following medical conditions: nervous colon, loss of hearing, diabetes, arthritis and a dermoid tumor in the eye. She takes several medications, which her treating physician indicates may cause her to become dizzy or experience abdominal pain.

In her disability report dated May 15, 1995, Plaintiff states that she does light housework, including vacuuming, dusting, laundry and cooking dinner. She also reads books three to four hours per day and watches television one to two hours per day. Plaintiff makes a trip to the library twice a week, where she remains for a couple of hours. In Dr. Narang's report from July 1995, Plaintiff states that she is able to walk three to four blocks slowly and climb a flight of stairs.

In June 1990, Plaintiff was officially diagnosed with non-insulin dependent diabetes mellitus. Two days later, plaintiff suffered a hypoglycemic seizure on June 23, 1990. Plaintiff has been prescribed an oral diabetes medication (Glynase), with some suboptimal control due to her inability to follow a diabetic diet and monitor her blood sugar level on a regular basis. She has not been prescribed insulin, and has not been diagnosed with any diabetes-related medical

complications, such as diabetic retinopathy.

During late 1991 and early 1992, Plaintiff suffered from Costochondritis. Medical records from November 1991, February 1992, April 1992, May 1992, and June 1992 indicate complaints consistent with this disorder. Plaintiff was treated with Naprosyn and Voltaren, with good result.

Plaintiff also has arthritis. On July 18, 1992, Plaintiff was examined for shoulder pain by Dr. Doria Devare. She had right shoulder tenderness with abduction and elevation. On September 12, 1992, Plaintiff complained of left shoulder pain but made no complaint of right shoulder pain. She had right shoulder pain on January 17, 1995. Dr. Parmod Narang noted right wrist tenderness, with slight swelling but no redness present, and slight swelling and tenderness of the right knee on July 13, 1995. Plaintiff's finger joints were tender on November 2, 1995, but with no swelling. On April 1, 1996, Dr. Stein noted that Plaintiff had arthritic pain in her neck, shoulders, and hips, and that this pain "gets worse as the day wears on." (R. at 189). He diagnosed Plaintiff with probable fibromyalgia in June, which he said prevented her from any type of conditioning exercise. In 1996, Plaintiff had been taking Ibuprofen for her arthritis.

Plaintiff suffers from obesity. In June 1990, Plaintiff weighed 250 pounds. Dr. Stein indicated in January 1995 that Plaintiff had been on "yo-yo" diets for years. (R. at 138). Over the period from 1990 to 1997, Plaintiff's weight was recorded as low as 232 pounds and as high as 258.

Plaintiff suffers from ulcers. Plaintiff had no prior history of ulcer in her April 1992 examination by Dr. Devare, but was prescribed Maalox, Tagamet, and Zantac in following checkups for gastritis. After an upper gastrointestinal exam was conducted, Plaintiff was

diagnosed by Dr. Ty Stein with an active ulcer of the duodenal bulb and mild gastroesophageal reflux in January 1996. She was given Prilosec and Pepto-Bismol.

Plaintiff has an eye tumor. In February 1995, Plaintiff was diagnosed with glaucoma and a dermoid conjuctival cyst of the right eye. Several records indicate that Plaintiff's vision is normal.

Plaintiff has limited hearing. Plaintiff is completely deaf in the right ear and wears a hearing aid in the left ear, which apparently enables her to understand normal conversation. She supplements this by reading lips. Although Plaintiff's speech is slow and impaired, it is understandable.

Plaintiff has also experienced mental illness including anxiety and depression. On October 6, 1993, Dr. Alexander Eschbach, a licensed clinical physician, evaluated Plaintiff in a neuropsychological screening. He reasoned that Plaintiff could perform simple, repetitive actions which require no decision making and little "executive" functioning; however, he opined that Plaintiff might become emotionally overwhelmed with duties that require problem solving, resulting in mildly to moderately debilitating anxiety and depression. ( R. at 156-57). Dr. Eschbach concluded that easily-learned, light manual tasks would be best for Plaintiff, rather than verbally-mediated tasks.

Dr. Phillip Mankoff, a state clinical psychologist, evaluated Plaintiff on November 13, 1993. Dr. Mankoff evaluated Plaintiff's IQ at 85, a low average classification. He found that Plaintiff seemed to be easily overwhelmed and had some anxieties, but felt that there was no need to recommend psychotherapy for her. Dr. Mankoff also concluded that Plaintiff would not do well with duties requiring problem solving, and if presented with such, Plaintiff would

7

become emotionally overwhelmed and experience moderately debilitating anxiety and depression. He recommended that she pursue easily-learned, repetitive light manual tasks, such as light office work and/or filing, and pursue JVS training to this end.

### Medical assessments of Plaintiff's work-related ability.

On July 24, 1995, Dr. Earl W. Donelan, M.D., a consulting physician for the state, examined Plaintiff for a residual functional capacity assessment. He found that Plaintiff could occasionally lift 50 pounds; frequently lift 25 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and no limitations on pushing and/or pulling, climbing, balancing, stooping, kneeling, crouching and crawling. Dr. Donelan also found limited abduction of Plaintiff's arms above her head.

Dr. Syed Asghar, M.D., one of the Plaintiff's treating physicians, examined Plaintiff on November 2, 1995. Dr. Asghar concluded that Plaintiff had moderate capacity to do work-related activities.

Dr. Ernst Bone, M.D., a state agency consulting physician, reviewed Plaintiff's medical records on January 17, 1996. He opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, and she could stand at least two hours and sit at least six hours in an eight-hour workday. Dr. Bone recommended no work requiring bilateral hearing acuity or prompt spontaneous speech for performance or safety.

On July 6, 1996, Dr. Ty Stein, M.D., Plaintiff's treating physician, stated on a medical assessment form that Plaintiff could stand and walk for 15 minutes at a time for one to two hours out of an eight-hour workday. He opined that she could sit eight-hours out of an eight-hour workday. Dr. Stein answered "no" to the question "Does your patient need to lie down

intermittently throughout the day?" (R. at 214). Dr. Stein believed that Plaintiff could lift 10 pounds occasionally and two to five pounds frequently, and had no restrictions in grasping, handling, and manipulating objects, but she was restricted from bending; pushing; and pulling; and reaching above her head.

In an addendum two months later, Dr. Stein stated that Plaintiff's "fatigue, sleep apnea, and daytime somnolence effectively prevents her from remaining attentive and alert enough to concentrate on even sedentary type tasks" and that "she is incapable of **any** type of work." (R. at 215) (emphasis in record).

On March 26, 1998, Dr. Gina Drugas, M.D., Plaintiff's treating physician, stated in her medical assessment that Plaintiff could stand for thirty minutes and walk for an hour uninterrupted, as well as stand or walk for four hours out of an eight-hour workday. In answer to the question "Does your patient need to lie down intermittently throughout the day?", Dr. Drugas indicated that Plaintiff takes a one-hour daily nap because of pain in her joints and also because it helps her relax. (R. at 270). According to Dr. Drugas, Plaintiff can carry 50 pounds occasionally and 10 pounds frequently; has no difficulty bending or reaching; should only push or pull a low weight; and says that she cannot open a jar and that she drops things easily.

## THE ALJ'S FINDINGS

1.    The claimant met the disability insured status requirements of the Act on August 30, 1990, the date the claimant stated she became unable to work, and continued to meet them only through March 31, 1997.

2.    The claimant has not engaged in substantial gainful activity at any time since August 30, 1990.

3.    The medical evidence establishes that the claimant is severely impaired by non-insulin dependent diabetes mellitus, bilateral hearing loss, obesity, peptic ulcer disease, arthritis, and fibromyalgia, but that she

does not have an impairment or combination of impairments which meets or equals the relevant criteria of any impairment listed at 20 C.F.R., Part 404, Subpart P, Appendix 1.

4. The claimant's subjective complaints and functional limitations are inconsistent with the record as a whole.

5. The claimant retains the residual functional capacity for work requiring lifting no more than twenty pounds occasionally and ten pounds frequently; standing and walking no more than two hours in an eight-hour work day, and sitting no more than six hours in an eight-hour work day; only occasional climbing, stooping, crouching, or crawling; no work around heights or dangerous moving machinery; only one-to-one communication with co-workers and supervisors; and no acute bilateral hearing.

6. The claimant's impairments preclude her from returning to her past relevant work.

7. The claimant is a younger individual, with a high school education obtained through special education classes, and some deficiencies in reading, spelling, and mathematics, and a history of no more than semi-skilled work, with no work skills transferable to her present residual functional capacity.

8. Considering the claimant's maximum sustained work capability, age, education, and past work experience, there are other jobs the claimant is capable of performing which exist in significant numbers in the national economy, including assembler, hand packager, and inspector.

9. The claimant has not been under a disability as defined in the Social Security Act at any time since August 30, 1990.

## B. Disability Evaluation Process

In order to establish a disability under the Social Security Act ("SSA"), a plaintiff must establish the existence of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 138c(a)(3)(A). A plaintiff must also show that the impairment renders her unable to engage in any substantial gainful employment. 42 U.S.C. § 138c(a)(3)(B). In determining whether a claimant is disabled, the ALJ must conduct a five step

inquiry: 1) whether the plaintiff is currently unemployed; 2) whether the plaintiff has a severe impairment; 3) whether the plaintiff has an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations; 4) whether the plaintiff cannot perform her past relevant work; 5) whether the plaintiff is incapable of performing work in the national economy. 20 C.F.R. §§ 404.1520; 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). An affirmative answer leads either to the next step, or, at Steps 3 and 5, to a finding of disability. A negative answer an any step, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled. *Clifford*, 227 F.3d at 868. The burden of proof is on the claimant at Steps 1 through 4; only at Step 5 does the burden shift to the Commissioner. *Id.*

### C. History of the Case

Ms. Welsh applied for Disability Insurance Benefits with a protective filing date of May 3, 1995. She alleged that she became disabled on August 30, 1990. Her application was denied initially and on reconsideration. In May 1998, a hearing was held before Administrative Law Judge (ALJ) Charles J. Frisch. Ms. Welsh, represented by counsel, appeared and testified, as did vocational expert Hamersma.

On June 25, 1998, ALJ Frisch, applying the above five-step inquiry for Social Security disability benefits, found that Ms. Welsh was not disabled. To satisfy the first step of the five-step process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date, August 30, 1990. In regards to the next step, the ALJ found that Plaintiff had the following severe physical impairments: non-insulin dependent diabetes mellitus, arthritis, fibromyalgia, partial hearing loss, a history of peptic ulcers and obesity. However, none of

claimant's impairments or a combination thereof met nor equaled the relevant criteria of a listed impairment.

The ALJ then determined the residual functional capacity of the claimant for work as follows: lifting no more than twenty pounds occasionally and ten pounds frequently; standing and walking no more than two hours in an eight-hour work day, and sitting no more than six hours in an eight-hour work day; only occasional climbing, stooping, crouching, or crawling; no work around heights or dangerous moving machinery; only one-to-one communication with co-workers and supervisors; and no acute bilateral hearing. From the testimony of a vocational expert, the ALJ concluded that claimant was unable to perform her past relevant work in her present residual functional capacity.

However, at Step 5, the ALJ primarily relied on this same testimony, as well as other evidence in the record, to show that the claimant had the ability to engage in other types of gainful employment in the national economy. Thus, the ALJ determined that Welsh was not disabled.

Welsh filed a complaint seeking judicial review of the ALJ's decision. The matter was referred to Magistrate Judge Rosemond, pursuant to Federal Rule of Civil Procedure 72(b), who submitted a Report and Recommendation on March 7, 2001. Judge Rosemond recommended that the ALJ's decision should be affirmed, that the Commissioner's motion for summary judgment should be granted, and that Welsh's motion for summary judgment should be denied. Welsh then filed objections to Judge Rosemond's Report and Recommendation. Under Federal Rule 72(b), this court must "make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which specific written objection

has been made in accordance with this rule." Fed. R. Civ. P. 72(b). This court may then accept, reject, or modify the recommended decision. *See id.* For the reasons set forth below, the court adopts Judge Rosemond's Report and Recommendation in part, and rejects it in part.

## II. Analysis

### A. Standard of Review

Defendant's decision denying disability benefits should be affirmed unless it is not supported by substantial evidence or it is based on an error of law. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Substantial evidence is that amount of evidence that a reasonable mind would accept as adequate to support a conclusion, taking into account anything in the record that fairly detracts from its weight. *Young v. Sec'y of HHS*, 957 F.2d 386, 388-89 (7th Cir. 1992). When reasonable minds could differ as to whether a claimant is disabled, the Commissioner, not the court, has responsibility for resolving conflicts. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reviewing court may not "decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the ALJ." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Despite this deference to the ALJ, when considering whether a decision to deny benefits is supported by substantial evidence, the court must look to see whether the ALJ built an adequate "bridge from the evidence to his conclusion." *Godbey v. Apfel*, 238 F.3d 803, 807 (7th Cir. 2000) (quoting *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000)).

### B. Welsh's Objections

Welsh maintains that the ALJ's decision to deny her disability benefits was not supported by substantial evidence. She advances three objections to the ALJ's decision (and correspondingly, to Judge Rosemond's decision): 1) that the ALJ did not adequately consider

evidence of her mental impairments, especially as they affect her in combination with her peptic ulcer flare-ups; 2) that the ALJ, by refusing to acknowledge certain limitations, did not give adequate weight to the reports of her treating physicians; and 3) that the ALJ's decision that Welsh's testimony was not credible was patently erroneous. The court will consider each of these objections in turn.

### *Mental Impairments*

Welsh first argues that she suffers from certain mental impairments which, especially when considered in combination with her peptic ulcer disease, limit her ability to work. The psychological reports of Drs. Mankoff and Eschbach each indicate that Welsh exhibited signs of anxiety, nervousness, and susceptibility to becoming overwhelmed. (R. at 156-57, 161-62). Welsh also testified that she experiences a flare-up of her ulcer when she gets nervous, although her testimony is the only evidence connecting her anxiety or nervousness to her ulcer flare-ups.

The ALJ dealt with the mental limitations at Step 2 of the five step analysis, stating:

> Further, the undersigned finds no evidence of any severe medically determinable mental impairment. The medical record documents that the claimant has intellectual functioning in the low average range, which is inconsistent with mental retardation. (Exhibit 28) The record documents some anxiety and nervousness due to her hearing impairment, but the claimant has not been diagnosed with clinical anxiety, or any other mental impairment, and has not undergone or been recommended for any psychological or psychiatric treatment.

(R. at 13). The ALJ did not expressly consider any of Welsh's mental limitations at any other point in his opinion, including the Step 5 analysis regarding residual functional capacity. This court has previously intimated that such a conclusory statement regarding mental impairments inhibits effective review of the ALJ's decision at Step 5. *See McElroy v. Apfel*, No. 97 C 6585,

1999 WL 199617, at *8-*9 (N.D. Ill. Apr. 2, 1999). In making the Step 5 determination of residual functional capacity ("RFC"), the ALJ must consider all of the relevant evidence in the record. 20 C.F.R. 404.1545(a). Thus, although the ALJ had already concluded (at Step 2) that Welsh did not present evidence of a "severe medically determinable mental impairment," he should have nonetheless considered the evidence of anxiety and nervousness that did exist in the record at Steps 4 and 5. Because the ALJ's discussion of the evidence of mental limitations is so cursory, it is impossible for this court to determine whether such evidence was fully considered by the ALJ in making the RFC determination. The failure to discuss undisputed evidence of some mental limitations in the process of determining Welsh's RFC renders the ALJ's explanation unacceptable. In this case, the ALJ did not build an adequate "bridge" from the evidence to his conclusions with respect to the RFC determination, and therefore remand is appropriate.[2]

Additionally, the ALJ should have considered the effects of Welsh's nervousness and anxiety in combination with her physical limitations, especially her ulcer flare-ups. *See generally*

---

[2] The court notes that there is some evidence in the record that would support the ALJ's Step 5 conclusion. Perhaps most significant is the fact that both Drs. Mankoff and Eschbach concluded that Welsh would be able to perform some limited work. Dr. Mankoff found that Welsh "could do well in simple repetitive actions which require no decision making functioning." (R. at 161). Dr. Eschbach found that Welsh could perform simple, repetitive actions which require no decision making or executive functions "very satisfactorily." (R. at 156-57). Moreover, although the limitations applied by the ALJ in his opinion did not include any mental limitations, the ALJ asked vocational expert Hamersma to assume that the patient experiences periodic nervousness, which upsets her stomach. Hamersma testified that given her age, experience, and other limitations, she would still be able to work at the light, unskilled level. (R. at 322-24). Nevertheless, this court is not required to independently evaluate and weigh the medical evidence and hearing testimony, but rather to determine whether the ALJ properly considered all of the relevant evidence. Because the ALJ does not build a logical bridge at Step 5 that assures this court that mental limitations were taken into account in determining residual functional capacity, the court cannot effectively trace his reasoning. Thus, a remand for further consideration consistent with this opinion is appropriate.

*Ostrowski v. Heckler*, 609 F.Supp. 1109, 1117 (N.D. Ill. 1985) ("Under the Reform Act, the ALJ *must* consider the combined effects of unrelated impairments even if each is not 'severe' in isolation."). Although the only evidence pertaining to a combined effect was Welsh's own testimony, that testimony is sufficient to fairly raise the issue. "When claimant's evidence 'fairly raises it, a medical expert should evaluate the combined effect of the claimant's impairments.'" *Lopez v. Chater*, No. 94 C 832, 1996 WL 473750, at *6 (N.D. Ill. Aug. 19, 1996).[3] Combined effects must be considered in determining the claimant's RFC and when deciding whether the claimant is capable of performing work. *See Biggs v. Apfel*, 99 C 3446, 2000 WL 1346702, at *3 (N.D. Ill. Sep. 14, 2000); *see also Gibson v. Sec'y of HHS*, 882 F.2d 329, 331 (8th Cir. 1989).

Viewing the record as a whole, it appears that no medical opinion directly considered the effect that increased nervousness due to job stresses might have on Welsh's ulcer, and the resulting limitations that would be imposed on her ability to work. Despite the existence of some evidence that working would cause more ulcer flare-ups and cause plaintiff to take more breaks throughout the day, the ALJ did not examine that possibility.[4] Rather, the ALJ simply relied on evidence that Welsh's flare-ups have been treated satisfactorily in the past with medication.[5] The

---

[3] The ALJ's hypothetical question to the vocational expert recognized that periodic nervousness would upset claimant's stomach, but did not discuss the frequency or severity of that problem in any detail. (R. at 322-23).

[4] For instance, the psychological reports indicate that Welsh became nervous when confronted with the relatively simple tasks involved in the psychological testing.

[5] The magistrate judge, in approving the ALJ's decision, noted that Welsh's activities, including going to the library and grocery store occasionally, show that Welsh's flare-ups are not so unpredictable as to confine her to her home. The magistrate judge also noted evidence in the record that other factors besides nervousness also cause Welsh's ulcer to flare up. These conclusions, however, do not consider the potential for additional stress on Welsh if she were to work full-time, even in an unskilled position. Nor do these conclusions consider the flexibility that her home life affords her, in contrast to the more structured demands of a full-time job.

16

defendant argues that Welsh is essentially asking the ALJ to determine on his own that her nervousness and ulcer are interrelated, improperly casting the ALJ in the role of doctor. But the ALJ had another option – he could have sought a medical opinion on the relationship between her nervousness and her ulcer. Defendant counters that even though it is always possible to do more, the question of how much evidence to gather is left to the discretion of the Secretary. (Resp. to Objections at 2) (quoting *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993)). Although the ALJ is entitled to substantial deference in this decision, the court can remand for further proceedings where the incremental benefits of such additional proceedings would substantially outweigh the burdens they would impose. *See generally Capobianco v. Shalala*, No. 92 C 8296, 1994 WL 87359, at *1 (N.D. Ill. Mar. 16, 1994).

Here, recontacting the treating physicians to obtain a medical opinion about the relationship between Welsh's nervousness and her ulcer, and the restrictions that they would place on her ability to work, would not impose a great burden on the Secretary. More importantly, the benefit of such an inquiry would be significant. The record suggests that such an inquiry could very plausibly lead to evidence that Welsh would need to take an excessive amount of breaks to cope with her ulcer, rendering her unable to work and entitling her to disability benefits. Welsh testified, and the ALJ apparently believed, that nervousness is one factor that causes her ulcer flare-ups. The psychological reports indicate Welsh's tendency to become nervous or anxious. The record reveals the possibility that even low-stress work would aggravate her ulcer, causing more flare-ups and resulting in the need for more breaks at work. The ALJ should obtain medical evidence concerning this possibility before concluding that she is capable of working.

*Treating Physicians' Reports*

Welsh's second argument is that the reports of her treating physicians, Drs. Stein and Drugas, were not given appropriate weight by the ALJ. Although the ALJ relied mainly on the the reports of Drs. Stein and Drugas in the RFC determination, Welsh argues that the ALJ ignored certain important aspects of their reports, including: Dr. Stein's comment that Welsh's overall endurance was extremely poor and that conditioning exercises were precluded by Welsh's fibromyalgia; Dr. Stein's statement that sedentary type tasks were precluded by fatigue and sleepiness, and his conclusion that Welsh was incapable of any type of work; Dr. Drugas' statement that Welsh had difficulty with grasping, handling, and manipulating objects with her hands; and Dr. Drugas' statement that she napped to relax her joint pains.[6]

The ALJ refused to recognize work limitations based on these medical statements, noting that Dr. Stein did not conduct any functional capacities evaluation that included an endurance test, and that Dr. Stein's treatment notes did not indicate any complaints of fatigue or any diagnosis of sleep apnea or daytime somnolence. The ALJ also recognized that Dr. Stein had originally indicated that Welsh did not need to lie down intermittently throughout the day. As to Dr. Drugas' statement that Welsh took a nap for one hour every day, the ALJ found that the statement was merely descriptive, and did not indicate that such a nap was medically necessary. He also discussed evidence that contradicted Dr. Drugas' statement about daily naps – namely,

---

[6] The difficulty in evaluating Welsh's functional limitations stems from the nature of fibromyalgia. Fibromyalgia is a disease with symptoms that are entirely subjective. Those symptoms can include pain all over, fatigue, disturbed sleep, stiffness, and multiple tender spots, which, when pressed firmly cause the plaintiff to flinch. *See Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). Although one may be diagnosed with fibromyalgia, "it is difficult to determine the severity of [the claimant's] condition because of the unavailability of objective clinical tests." *Id.* at 307.

Dr. Stein's original indication that Welsh did not need to lie down intermittently throughout the day. The ALJ also stated that while Dr. Drugas did note Welsh's claim that she dropped things and could not open jars, Dr. Drugas' report did not indicate any loss of hand strength, and his treatment notes did not reveal any hand-related complaints. Moreover, Dr. Stein's report, in contrast to Dr. Drugas' report, stated that there were no restrictions on Welsh's ability to grasp, handle, or manipulate objects.

Thus, although both treating physicians diagnosed Welsh with fibromyalgia, the evidence of certain symptoms was conflicting, ambiguous, or unsupported. Faced with this evidence, the ALJ determined that functional limitations based on those particular symptoms set forth above would be inappropriate. This is precisely the sort of determination that is appropriately made by an ALJ. *See Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999) ("Because the Commissioner is responsible for weighing the evidence, resolving conflicts, and making independent findings of fact, . . . this Court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner to decide whether a claimant is or is not disabled.") (citations omitted). Unlike the ALJ's failure to consider evidence of mental limitations, the ALJ's resolution of these issues was adequately explained in his opinion and supported by the record. The court, therefore, adopts the reasoning and conclusion set forth by Magistrate Judge Rosemond in his Report and Recommendation with respect to Welsh's second objection.

### *Credibility*

Finally, Welsh argues that the ALJ's negative credibility determination with respect to her testimony was erroneous. The court will disturb an ALJ's credibility finding only if it is "patently wrong in view of the cold record." *Pope v. Shalala*, 998 F.2d 473, 487 (7th Cir. 1993).

Here, the court cannot find that the ALJ's credibility determination was patently erroneous. The ALJ concluded that Welsh's "subjective complaints and functional limitations are inconsistent with the record as a whole." (R. at 22). Welsh argues that this determination was based entirely on an evaluation of Welsh's daily activities, and that her participation in a vocational rehabilitation program through January, 1995 was not considered by the ALJ in reaching his conclusion. The court finds, however, that the ALJ considered all of the relevant evidence in the record in making his credibility determination, and that his conclusion was supported by substantial evidence in the record.

Initially, the court notes that the ALJ did not rely solely on evidence of Welsh's daily activities. Rather, he considered Welsh's complaints and statements about her limitations in comparison to the objective medical findings in the record. (R. at 20). The ALJ found, for instance, that Welsh's testimony that she was unable to work after January, 1995 was not credible because the medical records from 1995 to March, 1998 contained minimal objective medical findings and indicated only minimal medical treatment. (R. at 20). At other points in his opinion, the ALJ contrasted plaintiff's complaints to the objective medical evidence and the reports of examining physicians. (R. at 17, 19). Moreover, the ALJ explicitly recognized that Welsh participated in a rehabilitation program through 1995, but questioned Welsh's desire to work after that point. (R. at 20). Thus, it cannot be said that the ALJ ignored Welsh's attempts at rehabilitation. Welsh's argument is essentially that the ALJ should have given more weight to that attempt at rehabilitation; but this court is not to re-weigh the evidence presented to the ALJ. *See Butera*, 173 F.3d at 1055. The ALJ's negative credibility determination was supported by substantial evidence in the record and was entirely appropriate. The court therefore adopts the

reasoning and conclusion of Magistrate Judge Rosemond with respect to Welsh's third objection.

## Conclusion

Magistrate Judge Rosemond's Report and Recommendation is adopted with respect to the weight given to the treating physicians' reports and plaintiff's credibility. However, the ALJ's determination of residual functional capacity erroneously omitted any discussion of the evidence concerning plaintiff's mental ailments, either alone or in combination with her ulcer. As a result, the ALJ's decision is reversed and remanded, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this opinion.

ENTER:

Joan B. Gottschall
United States District Judge

DATE:  April 19, 2001